Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| N.C., individually and on behalf of A.C. a minor,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>PREMERA BLUE CROSS,<br><br>　　　　Defendant. | COMPLAINT<br><br>Case No. 2:21-cv-00467-JCB |

Plaintiff N.C., individually and on behalf of A.C. a minor, through her undersigned

counsel, complains and alleges against Defendant Premera Blue Cross ("Premera") as follows:

## PARTIES, JURISDICTION AND VENUE

1.  N.C. and A.C. are natural persons residing in Middlesex County, Massachusetts. N.C. is

    A.C.'s mother.

2.  Premera is an independent licensee of the nationwide Blue Cross and Blue Shield

    network of providers and was the insurer and claims administrator, as well as the

fiduciary under ERISA for the insurance plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case.

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). N.C. was a participant in the Plan and A.C. was a beneficiary of the Plan at all relevant times. N.C. and A.C. continue to be participants and beneficiaries of the Plan.

4. A.C. received medical care and treatment at Change Academy Lake of the Ozarks ("CALO") from June 18, 2019, to August 23, 2020. CALO is a licensed residential treatment facility located in Missouri, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. CALO specializes in the treatment of individuals suffering from Reactive Attachment Disorder, a severe mental/behavioral health condition which is notoriously difficult to treat.

5. Premera, acting in its own capacity or by outsourcing its review obligations to outside entities, denied claims for payment of A.C.'s medical expenses in connection with his treatment at CALO.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because Premera does business in Utah and across the United States. Moreover, litigating the case in Utah rather than in another location will reduce the Plaintiff's out of pocket costs. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the

case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### A.C.'s Developmental History and Medical Background

9. A.C. was adopted by N.C. from Guatemala when he was a little over a year old. Even as a young child, A.C. suffered from severe anxiety and had difficulty making and keeping friends. He was often bullied by his peers. A.C. had an older sister who was adopted from Cambodia who had serious behavioral problems and was frequently verbally and physically aggressive.

10. A.C. had an older friend who he would visit several times throughout the year. Unbeknownst to N.C., this friend would often sexually abuse A.C. in secret. As A.C. grew older he began to lash out and behave more aggressively, especially when it came to his older sister.

11. During one anger filled tantrum, A.C. refused to calm down and started throwing everything he could get him hands on, forcing N.C. to have to call the police. A.C. frequently stated that he was suicidal and on one occasion he called the police and asked to be taken to the hospital because he didn't feel safe. He was then taken to the

emergency room. N.C. stated that while A.C. often threatened to commit suicide, she believed that this particular hospital visit was a cry for attention rather than an actual attempt to end his life.

12. A.C. obsessed over things like animals even though he didn't take care of the ones he had. A.C. had a distorted sense of reality and often perceived everyone to be against him and would often misrepresent events to portray himself as the victim.

13. A.C. saw a variety of therapists and a psychiatrist but none of them seemed to be effective. A.C. often refused to go to appointments, and one of his psychiatrists called him "the most unreasonable person" he had ever met. N.C. talked with A.C. about attending a short-term inpatient program but he became extremely upset, started throwing things, and attempted to punch her. N.C. called the ambulance and A.C. was hospitalized from April 4, 2019, to April 18, 2019.

14. A.C. was subsequently admitted to a therapeutic wilderness program called New Vision before being transferred to CALO. Both interventions were made based on the recommendations of the clinicians on his treatment team.

## CALO

15. A.C. was admitted to CALO on June 18, 2019.

16. In a letter dated September 3, 2019, Premera denied payment for A.C.'s treatment. The letter gave the following justification for the denial:

> The treatment guidelines we use state that continued residential treatment for a mental health condition is medically necessary when, because of a serious emotional disturbance, the following situations are true for you:
> - Within the last week, one of these is true for you:
>   - You have been having angry outbursts
>   - You have hurt or tried to hurt others or have thoughts about killing others
>   - You have hurt yourself or have thoughts about killing yourself

      • You have destroyed property, or you have other very serious psychiatric symptoms.
- OR, your symptoms have improved, discharge is planned within the next week, and either some treatment goals have not been met that will be met within the next week, or more work is needed with your family before you go home that will be done within the next week.

AND within the last week, one of these is also true for you:
- You have very bad relationships with other people
- You are interacting with others in very angry or threatening ways
- You can't or won't follow instructions or ask for help to get your needs met
- OR, your functioning has improved, discharge is planned within the next week, and passes are planned within the next week to help you get ready to go to another level of care.

Continued residential treatment for a mental health condition is denied as not medically necessary after 6/26/19. Information from your provider does not show any of the situations above on and after 6/26/19.

The treatment guidelines we use also state that, in addition to other requirements, continued residential treatment for a mental health condition is medically necessary only when a psychiatric evaluation was done within one business day of admission, and is then being done at least one time per week (every 7 days), by a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant, and when an individualized goal-directed treatment plan is completed within 1 week after admission. The information from your provider does not show any psychiatric evaluations by a psychiatrist, psychiatric nurse practitioner, or psychiatric physician assistant, after 6/26/19, and shows that the first treatment plan was not completed until more than 6 weeks after admission.

17. On February 19, 2020, N.C. submitted a level one appeal of the denial of payment for the denial of payment for A.C.'s treatment. N.C. stated that Premera was obligated under ERISA to provide her with certain rights, including a responsibility to take into account all of the information she provided, to use appropriately qualified reviewers and disclose their identities, to give her the information necessary to perfect the claim, to act in her best interest, and to provide her with a full, fair, and thorough review of the denial.

18. N.C. pointed out that she had received "confusing and contradictory information" in the denial letter. She wrote that Premera had not been consistent with the dates of service it

listed, and it appeared that Premera was only denying payment for treatment rendered after June 26, 2019, even though A.C. was admitted to CALO on June 18, 2019. N.C. asked Premera to resolve this discrepancy and to let her know immediately if it had in fact approved the initial portion of A.C.'s treatment.

19. N.C. wrote that she had requested a copy of the criteria used to evaluate the claim but the Premera representative refused to provide it. The representative stated that this information was available on the InterQual website, but N.C. stated that this was not the case as the criteria were proprietary and not freely available.

20. She also said that the Premera representative had referred her to criteria which had not been mentioned in the actual denial letter. She protested this action and stated that if these criteria were in fact used that fact should have been disclosed in the denial letter. She contended that Premera's actions significantly hindered her ability to effectively appeal the denial.

21. N.C. contended that Premera's requirements that A.C. meet with a psychiatrist on admission and again every seven days were completely arbitrary. She stated that A.C. met with a psychiatrist "as often as is clinically indicated, at times as frequently as every four or six days." She also stated that A.C.'s treatment plan was created on the day of his admission to CALO.

22. N.C. argued that Premera was applying a stricter standard to A.C.'s treatment than that allowed by the terms of the insurance contract. She wrote that Premera's own policies acknowledged that they were superseded by the actual language of the insurance policy.

23. She wrote that according to her insurance policy any licensed or certified facility met the definition of a "Provider" so long as it was acting in within the scope of its license. She

identified CALO as a licensed and accredited residential treatment facility and stated that Premera could not arbitrarily limit the availability of this treatment by imposing additional requirements through the use of internal policies.

24. N.C. alleged that Premera's criteria violated generally accepted standards of medical practice in a manner which the court had found to be impermissible in *Wit et. al., v United Behavioral Health*. N.C. wrote that Premera relied on factors such as a danger to self or others and similar acute level symptoms to deny payment. N.C. asked Premera to rely on the definition of medical necessity identified in her insurance policy rather than proprietary guidelines.

25. N.C. argued that Premera had failed to consider other factors as well, such as the complexity of A.C.'s mental health conditions and the fact that he was receiving residential treatment care because other interventions had failed and it was recommended by his treatment team.

26. N.C. quoted Premera's acute inpatient hospitalization criteria and residential treatment criteria and noted that they were strikingly similar. She wrote that residential treatment centers were not designed nor equipped to handle acute level symptoms. She offered the analogy that this requirement would be akin to requiring a patient to be actively experiencing a heart attack before they could begin receiving treatment at a skilled nursing facility.

27. N.C. asserted that Premera had violated MHPAEA by imposing stricter requirements on mental healthcare than it imposed on analogous medical or surgical facilities. N.C. identified skilled nursing care as one of the medical or surgical analogues to the residential treatment A.C. received and argued that Premera did not require its insureds to

exhibit acute level symptoms for its skilled nursing services to be approved but it had placed such a requirement on A.C.'s mental healthcare.

28. N.C. requested that Premera perform a parity analysis to determine whether or not the Plan was truly in compliance with MHPAEA. N.C. asked to be provided with a copy of the results of this analysis as well as any and all documentation used. She stated that she was entitled to this information under MHPAEA.

29. N.C. argued that A.C.'s treatment was recommended by his treatment team and included letters of medical necessity with the appeal. In a letter dated February 11, 2020, family friend Martha Levinson wrote:

> …[N.C.] has raised two adopted, traumatized children as a single mother and the journey has been harsh. She has employed every tool she could possibly think of and access to provide them with the help they needed. Despite this continuing effort, and especially as he has matured physically and gained physical strength, [A.C.]'s behavior just before his hospital commitment and move into CALO, had devolved to the point where [N.C.] was sometimes not safe with her own son. …

Family friend and social worker Susan Johnson wrote in a letter dated February 11, 2020:

> …As [A.C.] entered full blown adolescence his depression and post trauma issues began to interfere with his school attendance and relationship with his mom and with me. He started refusing to attend school and do his school work. He would no longer go out with me often telling me to leave early. My conversations with his mom revealed how poorly he was doing in all aspects of his life and that his anger posed a real threat to himself and his mother.  He had to be hospitalized because he was decompensating so rapidly. After being inpatient for a while his mom with input from the staff at the hospital felt he needed an intensive program for teens suffering severe trauma issues. This was arranged and [A.C.] acknowledged that he needed this kind of help. He has since transferred to a residential treatment center where he has finally begun to address the trauma and feelings that had so dramatically overwhelmed his ability to participate in school, in family life, and with friends. My observations of his behaviors was that he was at times suicidal as well as unable to control his rage at his mom, sister and any one he perceived posed a threat…

Emily Buck, PMHNP-BC wrote in a letter dated February 7, 2020:

…During the course of his treatment, I managed [A.C.]'s psychiatric medications, provided diagnostic assessment, and worked with [A.C.], his mother, and his treatment team in developing a safe discharge plan for [A.C.]. During family meetings with his mother, we discussed the potential benefits of a therapeutic residential program for [A.C.]. His mother decided to have [A.C.] discharge to a Wilderness Program…

Marcus Favero, MD, wrote in a letter dated February 3, 2020:

…[A.C.] was challenging to treat due to his hostility, distrust and inability to tolerate discussion about his functional difficulties and psychiatric symptoms. Trials of several different antidepressants, mood stabilizers and stimulants (for ADHD) appeared to be only marginally helpful. In the last several months in which he was my patient, he dropped out of outpatient psychotherapy and started refusing to see me as well. …

…[A.C.]'s mother kept in close contact with me during the early spring of 2019 as his condition continued to deteriorate. I recommended she work towards hospitalization for shorter-term stabilization, and I consulted to Emily Buck, PMHNP-BC, the psychiatric nurse practitioner in charge of his care during his hospitalization at Franciscan Children's Hospital in April 2019. My assessment at that time was that neither outpatient nor short term acute treatment were sufficient to meet his needs. Due to his chronic and deteriorating symptom picture, increasing dysfunction at school and home, hostility and/or complete withdrawal in relationships, and concerns related to his and others' safety, I concluded that he met medical necessity criteria for long term residential treatment and recommended this course be pursued. …

Amber Haines, LICSW wrote in a letter dated February 12, 2020,

…[A.C.] entered treatment with myself due to several attempts with previous therapists that were not successful in engaging him in therapy. His mother sought myself out due to my background in collaborative treatment with children and adolescents and trained experience in evidence-based trauma work…

During outpatient treatment [A.C.] presented with Post Traumatic Stress Disorder and had active symptoms that made life functioning very difficult. His symptoms interrupted healthy relationships in the family, school and community environment. He presented with aggressive behaviors, provocative behavior and language and periods of unsafe feelings. Due to the trauma history and attachment problems he was unable to engage in effective outpatient therapy and became resistant and combative in treatment. He was unable to receive and accept recommendations and responded by impulsively refusing to engage in continued therapy therefore therapy ended abruptly and against the recommendation of myself and his mother. …

30. N.C. wrote that all of A.C.'s treating professionals felt that his treatment was medically necessary and expressed concern that Premera was disregarding the opinions of the "highly-trained clinical professionals who worked with [A.C.] on a first-hand basis." She asked Premera to elaborate on what basis it disagreed with A.C.'s providers.

31. N.C. asked that in the event Premera upheld the denial that it provide her with a copy of the specific reasoning for the denial and any corresponding supporting evidence, along with any administrative service agreements that existed, any clinical guidelines or medical necessity criteria used to evaluate the claim, any mental health, substance use, skilled nursing, inpatient rehabilitation, or hospice criteria used to administer the Plan, as well as any reports or opinions from any physician or other professional regarding the claim. (collectively the "Plan Documents")

32. Premera initially failed to process this appeal, leading N.C. to file a complaint with the State of Washington's Office of the Insurance Commissioner. Following this complaint, Premera claimed that it could not verify it ever received the appeal, but it would allow the Plaintiffs to resubmit the appeal and Premera would process it.

33. In a letter dated July 29, 2020, Premera upheld the denial of payment for A.C.'s treatment. The letter stated in part:

> As of June 27, 2019, [A.C.] was not wanting to harm himself or others. He was able to care for his daily needs and was not hearing or seeing things that were not there. [A.C.] was participating in treatment and did not have any severe depressive symptoms that required around the clock nursing supervision. [A.C.] could have been safely managed in a less restricted setting. Therefore, the claims for services after this date are denied.

34. The letter also included additional information from the reviewer who conducted the analysis. The reviewer chose six treatment dates between June 27, 2019, and October 30, 2019, to comment on and, notably in each of the six instances the reviewer selected, they

commented on A.C.'s lack of suicidal ideation, and in five of these six instances, they

also pointed out A.C.'s lack of homicidal ideation and hallucinations, suggesting that

these factors played a prominent role in the decision to deny payment.

35. The letter then asked the reviewer to address in layman's terms why the request was

denied, "*addressing each argument that the claimant raised, if any.*"[1] The reviewer's

response to this question was the justification for the denial referenced above in

paragraph 33. The reviewer also included a more complete justification for the denial

which stated in part:

> The patient is diagnosed with Major depressive disorder, recurrent, mild, Anxiety
> disorder, unspecified, and Attention-deficit hyperactivity disorder, predominantly
> inattentive type. As of 6/27/19 the patient was not reported to be suicidal,
> homicidal, or gravely impaired for self-care. There was no report of self-harm. He
> was not actively aggressive. The patient was able to care for his daily needs. He
> did not report any auditory or visual hallucinations. The patient was compliant
> with treatment and was attending family and individual therapy sessions. The
> patient continued to make progress to the point that could have allowed him to be
> treated in a lower level of care. He was not psychotic, delusional, or manic. He
> did not have any severe depressive symptoms that required 24-hour nursing
> supervision. From the clinical evidence, the patient could have been treated in a
> lower level of care such as partial hospitalization.

36. On August 27, 2020, N.C. submitted a level two appeal of the denial of payment. N.C.

expressed her displeasure with Premera's use of an external reviewer to evaluate the

claim when she was given no indication this would happen. She argued that Premera had

failed to comply with its obligations under ERISA and had not addressed the arguments

she raised in the appeal process including the lack of compliance with MHPAEA that she

had alleged. She asked Premera to correct these discrepancies and to conduct the next

review in accordance with ERISA.

---

[1] Emphasis in original

37. N.C. argued that not only had Premera failed to address her arguments regarding its violation of MHPAEA, but it also persisted in violating the statute by continuing to rely on factors such as acute dangerousness for subacute residential treatment, while imposing no such requirements on sub-acute medical facilities.

38. N.C. enclosed copies of Premera's criteria for skilled nursing facilities to demonstrate that it imposed more stringent requirements on intermediate level mental health services than it did on intermediate level medical or surgical services. N.C. again asked Premera to perform a MHPAEA compliance analysis and to provide her with a copy of the results.

39. N.C. pointed out that Premera's reviewer had chosen six dates of service, which as A.C. had completed nearly a year of treatment appeared to be chosen, "completely out of context and seemingly at random." She argued that it was disingenuous to cherry pick six "good days" in an attempt to show that treatment was no longer necessary. She contended that if the reviewer had looked at the treatment as a whole rather than selectively analyze a few portions of A.C.'s treatment, they would have come to the conclusion that the treatment was medically necessary.

40. N.C. wrote that A.C. satisfied the Plan's definition of medical necessity and again asked to be provided with a copy of the Plan Documents.

41. In a letter dated September 21, 2020, Premera upheld the denial of payment for A.C.'s treatment. The letter gave the following justification for the denial:

> Your request was denied based on a review of the clinical information submitted. [A.C.] does not meet medical necessity criteria for residential level of care from 6/27/2019 forward. [A.C.] has no dangerous psychiatric behaviors, comorbid medical problems, withdrawal symptoms or other gross dysfunction that would necessitate this level of care. It appears that he could be cared for at a lower level of care during this time. Kupfer and colleagues as well as Davidson[2] highlight

---

[2] The documentation attached to the appeal shows that the Kupfer and Davidson materials referenced are academic journal articles about Major Depressive Disorder.

treatment options for major depression and it appears that these could be utilized at a lower level of care in this case from the above-mentioned dates forward.

42. The letter included additional information which shows that Premera again utilized an external review agency to assess the claim. The reviewers opined that A.C.'s treatment did not meet the Plan's definition of medical necessity. When asked to give a justification for the denial in layperson's terms, again "*addressing each argument that the claimant raised*"[3] The reviewers[4] wrote:

> You do not meet criteria for residential level of care from 6/27/2019 forward. You do not have any active plans to end your life or others. You do not have any medical problems. You are not withdrawing from drugs. As such, the request is not approved.

43. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

44. The denial of benefits for A.C.'s treatment was a breach of contract and caused N.C. to incur medical expenses that should have been paid by the Plan in an amount totaling over $275,000.

45. Premera failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of N.C.'s requests.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

46. ERISA imposes higher-than-marketplace quality standards on insurers and plan

---

[3] Emphasis in original

[4] This letter was signed by Micah Hoffman, MD, and David Spiro MD. The July 29, 2020, denial was signed by Ashraf Ali, MD. and once again by David Spiro, MD. ERISA prohibits insurers from using the same reviewer to evaluate a claim in which they were previously involved. As Premera outsourced each review to ALLMED, an external review agency, Premera is not necessarily at fault for this failure to adhere to the statute; nevertheless, it appears that the Plaintiffs' appeals were evaluated in a manner which did not comply with the protections they are guaranteed under ERISA.

administrators. It sets forth a special standard of care upon plan fiduciaries such as

Premera, acting as agent of the Plan, to discharge its duties in respect to claims

processing solely in the interests of the participants and beneficiaries of the Plan. 29

U.S.C. §1104(a)(1).

47. Premera and the Plan failed to provide coverage for A.C.'s treatment in violation of the

express terms of the Plan, which promise benefits to employees and their dependents for

medically necessary treatment of mental health and substance use disorders.

48. ERISA also underscores the particular importance of accurate claims processing and

evaluation by requiring that administrators provide a "full and fair review" of claim

denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation

appeal process. 29 U.S.C. §1133(2).

49. The denial letters produced by Premera do little to elucidate whether Premera conducted

a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full

and fair review" to which they are entitled. Premera failed to substantively respond to the

issues presented in N.C.'s appeals and did not meaningfully address the arguments or

concerns that the Plaintiffs raised during the appeals process.

50. In addition, Premera and its agents engaged in other prohibited practices such as using

David Spiro, MD to evaluate multiple appeals despite ERISA's express prohibition of

this practice.

51. Premera's review agency ALLMED also failed to comply with its own procedures for

conducting the review. Each of the letters instructed the reviewers to address in detail all

of the arguments raised during the appeal process, however it appears the reviewers did

not follow this instruction as most, if not all, of the Plaintiffs' arguments were not

referenced in any capacity.

52. Premera and the agents of the Plan breached their fiduciary duties to A.C. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.C.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.C.'s claims.

53. The actions of Premera and the Plan in failing to provide coverage for A.C.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

### SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

54. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Premera's fiduciary duties.

55. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

56. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

57. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not
limited to, medical management standards limiting or excluding benefits based on
medical necessity; refusal to pay for higher-cost treatment until it can be shown that a
lower-cost treatment is not effective; and restrictions based on geographic location,
facility type, provider specialty, or other criteria that limit the scope or duration of
benefits for mental health or substance use disorder treatment. 29 C.F.R.
§2590.712(c)(4)(ii)(A), (F), and (H).

58. The medical necessity criteria used by Premera for the intermediate level mental health
treatment benefits at issue in this case are more stringent or restrictive than the medical
necessity criteria the Plan applies to analogous intermediate levels of medical or surgical
benefits.

59. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the
benefits the Plan excluded for A.C.'s treatment include sub-acute inpatient treatment
settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation
facilities. For none of these types of treatment does Premera exclude or restrict coverage
of medical/surgical conditions by imposing restrictions such as an acute care requirement
for a sub-acute level of care. To do so, would violate not only the terms of the insurance
contract, but also generally accepted standards of medical practice.

60. When Premera and the Plan receive claims for intermediate level treatment of medical
and surgical conditions, they provide benefits and pay the claims as outlined in the terms
of the Plan based on generally accepted standards of medical practice. Premera and the
Plan evaluated A.C.'s mental health claims using medical necessity criteria that deviate
from generally accepted standards of medical practice. This process resulted in a

disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

61. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Premera's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that A.C. received. Premera's improper use of acute inpatient medical necessity criteria is revealed in the statements in Premera's denial letters such as "You do not have any active plans to end your life or others."

62. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that A.C. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

63. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

64. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

65. The Plaintiffs directly alleged that Premera did not impose requirements such as risk of

suicide or other prerequisites like hallucinations for intermediate level medical care such as skilled nursing facilities, yet the denial letters overwhelmingly list these as factors involved in the denial process.

66. In fact, in her level one appeal N.C. accused Premera of "cherry-picking" six dates to show that treatment was not medically necessary. The reviewers' own notes consistently list a lack of suicidal behavior and other acute level factors as justifications for denying care, demonstrating that this was one of the reviewers' primary justifications for the denial.

67. Premera also imposed other requirements on residential treatment care which it does not equally apply to medical or surgical care, such as immediate evaluation by a psychologist with at-least weekly evaluations afterward. N.C. pointed out that CALO was a licensed and accredited facility which conducted such examinations as often as they were clinically indicated and as often as dictated by generally accepted standards.

68. As another example of Premera wrongly imposing acute inpatient standards of care and medical necessity criteria to evaluate A.C.'s treatment at CALO, Premera stated that A.C. did not require 24-hour nursing supervision. But A.C. did not receive 24-hour nursing supervision at CALO, generally accepted standards of care do not require 24-hour nursing care, and 24-hour nursing care was not necessary or appropriate for A.C.

69. N.C. stated that Premera was in direct violation of MHPAEA through these actions and asked it to provide her with the Plan Documents she required to further assess the claim and also asked Premera to conduct its own MHPAEA compliance analysis and to provide her with a copy of the results.

70. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Premera, as written or in operation, use processes, strategies, evidentiary standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, evidentiary standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

71. Premera and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Premera and the Plan were not in compliance with MHPAEA.

72. The violations of MHPAEA by Premera and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendant from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiffs for their loss arising out of the Defendant's violation of MHPAEA.

73. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.   Judgment in the total amount that is owed for A.C.'s medically necessary treatment at CALO under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.   Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.   Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.   For such further relief as the Court deems just and proper.

DATED this 29th day of July, 2021.

By ____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Middlesex County, Massachusetts.